## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**IN THE MATTER OF THE
SEIZURE OF:**

[A] DOCUMENTS,

[B] 2 HARD DRIVES,

[C] 2 USB THUMB DRIVES

[D] 1 CELL PHONE

[E] 1 TABLET

**REF. NO. 19-1679 (SCC)**

**REF. NO. 19-1680 (SCC)**

**MISC NO.** 19-mc-308 (FAB)

RECEIPT # PUR3245208
AMOUNT: $40.00

SEP 0 6 2019

CASHIER'S SIGNATURE

## DEMAND FOR THE RETURN OF SEIZED PROPERTY PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 41(g)

The Claimants, NAICOM CORPORATION, NAICOM DATA CENTER, ARTIST DESIGNS AND MANAGEMENT CORPORATION, KIARAS, LLC, DARWIN QUIÑONES-PIMENTEL AND VICTOR VEGA-ENCARNACION, (hereinafter collectively the "Claimants"), by and through their undersigned attorney Rafael Castro Lang-Esquire, respectfully files this Demand for the Return of Seized Property and Incorporated Memorandum of Law, based upon the seizure and continued retention of claimant's property are unlawful; no probable cause existed to issue the search and seizure warrant; the affidavit contained material factual allegations with reckless disregard for the truth as well as material omissions of fact necessary to an accurate assessment

of whether probable cause existed for the issuance of search and seizure warrant against Naicom Corporation (Offices) and Naicom Corporation (Data Center).

## FACTUAL BACKGROUND

NAICOM'S GENESIS

Sometime during the years 2002-2012, Naicom's President and Chief Executive Officer, Darwin Quiñones-Pimentel ("Darwin"), a veteran systems architect with expertise in coding, application design, defined architectures and success project leadership and many other extraordinary skills, began working on the development of a Multicast System (Dynamic Internet Semantic Multicast Environment "DISME"), to broadcast media via the internet and create an IPTV service to distribute Live-Video Television Content (media) via the internet and private networks, although experts in the internet field claimed it was impossible.    See Copy of Darwin's Curriculum Vitai.    Attachment 1.    See also Copy of Ward Louckx, Bachelor's Thesis Information Technology, and Streaming Media over Multicast.    Attachment 2 (page 53[1]).

On April 9, 2012, the Federal Communications Commission (FCC), issued its Second Report of the Video Programing Accessibility on the Twenty-First Century Act of 2010, recognizing and encouraging the implementation of distribution of Digital Broadcast Television using Internet Protocol Television (IPTV) for customers in the United States.    See Copy of FCC Report.    Attachment 3.

Naicom[2] Corporation Establishment.

---

[1] At Page 53, the thesis concludes as follows, "As end conclusion it must be said that multicast is an efficient way of working, with a lot of advantages, but for now with the current factors there is only place for streaming media over **unicast on the internet.**    The thesis concluded that on May 2013 it was impossible to stream media over the internet using multicast system.

[2] NAICOM stands for Networks And Internet Communication Company.

In 2016, Darwin completed all alfa tests on the DISME Technology and founded with Victor Vega Encarnacion Naicom Corporation Naicom, a Network & Internet Communication Platform that delivers live Television, Video on Demand content via private fiber and wireless network to subscribers worldwide instant access to their favorite TV Shows, Movies, Music/Videos on Demand and Live Sports & Music events through our Set-Top-Box (IPTV) and TV Everywhere (TVE) on any mobile device.

In 2016, Naicom Corporation was duly registered in the State Department of Puerto Rico as a closed corporation business company doing business in Puerto Rico and complied with all the requirements to perform as a legitimate business.   See Copy of Certificate of Merchant Registry. Attachment 4.   See also Copy Department of State Certificate of Registry.  Attachment 5.   See also Copy Department of State Certificate of Incorporation Close Corporation.   Attachment 7. See also Copy of Puerto Rico State Taxes Payment.   Attachment 8.  See also Copy Naicom's 2018 Annual Report Balance Sheet filed State Department of Puerto Rico.  Attachment 9.  See also Copy of Naicom's United States of America Patent and Trademark Office Registry Certificate.  Attachment 10.

In 2016, Naicom Corporation also requested the manufacture of its own brand set top boxes for end users through Informir LLC.   See Copy of Informir LLC business company information.  Attachment 11.

In 2017, Naicom Corporation also acquired the licenses to distribute television media and video on demand content in United States, Puerto Rico and Virgin Islands through worldwide television network companies and also became a member of the National Rural Telecommunications Cooperative "NRTC".   See Copy of Turner Network Contract, Invoices and Payment Confirmation.   Attachment 12.  See also Copy of Condista-Network Contract.

Attachment 13.  See also Copy of TV Azteca-Network Contract.  Attachment 14.  See also Copy of Vubiquity, Inc. Master Service Agreement, VOD Services Agreement and Transport Services Agreement.  Attachment 15.   See also Copy of NRTC Welcome Package Checklist, Start Business Form, NRTC Data Reporting Requirements, Programming Distribution Services, Affiliation Agreement, NRTC Member Certificate, Contract, Invoices and Payments Confirmation and Programing Agreement List containing 61 Total Network and 94 Channels (see pages 22-29 Naicom acquired total of 185 TV channels).  Attachment 16.  See also Copy of NBA TV Affiliation Agreement.  Attachment 17.   See also Copy of FOX-Network Contract, Invoices and Payment Confirmation.  Attachment 18.  See also Copy of Gracenote Contract.  Attachment 19.  See also Copy of ABC-Network Retransmission Consent Agreement Contract, Invoices and Payment Confirmation.  Attachment 20.  See also Copy of WAPA-TV Contract, Invoices and Payment Confirmation.  Attachment 21.  See also CBS Network Retransmission Agreement Contract.  Attachment 22.  See also Copy of NBC Universal Network Distribution Agreement Contract, Invoices and Payment Confirmation.  Attachment 23.   See also Copy of TV Española Network Contract.  Attachment 24.

Naicom Corporation begun exploring the search of potential investors and prepared Naicom's Business Executive Summary and Valuation for Investors.   See Copy of Naicom's Business Executive Summary.   Attachment 24 and also Copy of Naicom's Valuation for Investors.  Attachment 25.

In 2017, Naicom began negotiations with CLARO Puerto Rico to have Claro distribute Naicom Set Top Boxes to their customers and replace Dish Network contracts with Claro and created enemies in the industry of Cable and IPTV market.

## THE DISH NETWORK INVESTIGATION.

In August, 2017, NagraStar[3] purchased an end user Set Top Box receiver from Naicom to conduct tests[4] and monitor the programming offered by Naicom.   See Copy of Naicom's CRM Business Records.  Attachment 26.  According to NagraStar and Dish Network investigators the receiver provided access to approximately 43-channels-including channels such as Disney. TBS, ESPN, CNN, HBO, Showtime, and Cinemax.  NagraStar downloaded the application, which required the same login credentials as the receiver and provided access to approximately 42 channels.   See Copy of the Affidavit pages 6-7 ¶ 9.  Attachment 28.   The Naicom Service was tested several times to identify if it was providing DISH programming and in each case the test revealed no DISH content.     See Copy of the Affidavit pages 7 ¶ 11.   Attachment 28. Nevertheless, NagraStar and Dish Network investigators had another motive and filed a complaint with the Federal Bureau of Investigations that Naicom Corporation was running a pirate operation.

## THE FBI INVESTIGATION

On August 27, 2019, the Department of Justice through the Federal Bureau of Investigation Department applied for a Search and Seizure Warrant which was reviewed and approved by AUSA Nicholas W. Cannon to search the premises of Building Centro de Seguros, 701 Ponce de Leon, **Suite 208,** San Juan, Puerto Rico 00907; and Villa Fontana, 4SS N2 Via Josefina, Carolina, PR 00983 further described in Attachment A.

The basis for the search under Fed.R.Crim.P. 41(c) alleged that the search was directed to gather evidence of a crime; contraband fruits of a crime, or other items illegally possessed; property designed for use, intended for use, or used in committing a crime.   The Search Warrant

---

[3] NagraStar is a subsidiary of DISH Network and Kudelski Group.
[4] Upon information and belief, DISH Network has been conducting reverse engineering test against Naicom's Set Top Box middle firmware and Naicom's Servers in an attempt to gain access to trade secrets system codes of DISME Technology to implement the distribution of media programming via the internet and access millions of potential subscribers and new clients.

was authorized by U.S. Magistrate Judge Silvia Carreño-Coll who commanded the "FBI" to execute the warrant on or before September 4, 2019.  On August 27, 2019, at 12:80 PM the FBI executed the search warrant and seized Documents, 2 Hard Drives, 2 USB Thumb Drives, 1 Cell Phone and 1 Tablet from Naicom Corporation, Naicom Data Center, Artist Designs and Management Corporation Offices located at Building Centro de Seguros, 701 Ponce de Leon, **Suite 207**[5], San Juan, Puerto Rico 00907.   See Copy of Application for a Search Warrant Case No. 19-1680 (SCC); Search and Seizure Warrant Case No. 19-1679 (SCC); and Receipt of Property singed executed by FBI/SA Lance Lange.   Attachment 28.

1.   The Affidavit in Support of an Application for a Search Warrant.

    B.  Probable Cause.

    FBI/SA Lance Lange stated under penalty of perjury:

i.   That he had probable cause that Naicom Corporation was part of a history of IPTV and Television Piracy implicating several violations of federal laws, to wit., 17 U.S.C. § 506 (Copyright Criminal Offenses), 18 U.S.C. § 2319 (Criminal Infringement of a Copyright), as well as Money Laundering, Wire Fraud, and Unlawful Access to Computer Systems.   See Copy of the Affidavit page 2 ¶ 4 and page 3-4 ¶ 6. Attachment 28.

ii.   That an investigation conducted by NagraStar and confirmed by him revealed that there was evidence of Naicom's unauthorized use of Direct TV signal to distribute its programing to its paid subscribers when on August of 2017, NagraStar purchased a receiver from Naicom to conduct tests and monitor the programming offered y Naicom.   The receiver provided access to approximately 43-channels-including channels such as Disney. TBS, ESPN, CNN, HBO, Showtime, and Cinemax. NagraStar downloaded the application, which required the same login credentials as the receiver and provided access to approximately 42 channels.  Now Naicom offers more channels than when this investigation took place.  See Copy of the Affidavit pages 6-7 ¶ 9.  Attachment 28.

---

[5] The FBI in cohorts with Dish Network and NagraStar investigators also raided Artist Designs Offices located at Suite 207 when the warrant only authorized Suite 208 (Naicom's Offices).  This was an illegal search and seizure performed at Artists Designs Offices, in addition, FBI and Dish Network and NagraStar investigators also seized documents belonging to Kiaras, LLC which has nothing to do whatsoever with Naicom Corporation the target of the investigation.

iii.   That The Naicom Service was tested several times to identify if it was providing DISH programming and in each case the test revealed no DISH content. On August 28, 2017, a DirecTV error message was discovered on 14 channels: AMC, Animal Planet, Bein Sports, Cinemax, CNN-Español, Discovery Channel, Disney, E!, Entertainment, ESPN, FX, History Channel, Showtime, and USA.  On September 18, 2017, a DirectTV error messages was discovered on two channels: HBO and History Channel.   On September 19, 2017, a DirecTV error message was discovered on the Showtime Channel.  See Copy of the Affidavit pages 7 ¶ 11.  Attachment 28.

iv.   Consequently, an unprompted and routine error message from DirecTV popped up on Naicom's channels while NagraStar was searching through their content. The probable conclusion is that Naicom, not having any contract with DirecTV, was distributing those channels from DirecTV in an unlicensed manner.  See Copy of the Affidavit pages 8 ¶ 12.  Attachment 28.

v.   On December 7, 2018 special agents[6] of the Federal Bureau of Investigation (FBI) conducted a site survey of Naicom. A site survey is a common practice used in the FBI to gather intelligence on a location, the type of people there, and what activities are taking place. During the site survey, one of the agents of the FBI attempted to get a layout of inside the store location. The agent was taken to see Darwin Quinones and Victor Vega, the founders of Naicom.  The agent did not disclose to Quinones and Vega that the corporation was being investigated. During the conversation, Vega and Quinones showed the agent their product on a TV screen in a conference room. Vega and Quinones showed many channels, movies, and features of their IPTV box. Throughout the conversation, Vega repeatedly told the agent that Naicom was a legal corporation and showed[7] the agent a certificate from the National Cable Television Cooperative (NCTC) on the wall.   See Copy of the Affidavit pages 8-9 ¶ 13. Attachment 28.

vi.   That a call was made to NCTC's management group by an agent of the FBI on December 19, 2018. The agent spoke with Brian Jones of NCTC, who stated that Naicom was not a member of NCTC. The only member of NCTC in Puerto Rico was Liberty Cable. Consequently, the company's stated basis for access to the 300 channels offered by Naicom appears to have been baseless.   See Copy of the Affidavit page 10 ¶ 15.  Attachment 28.

---

[6] At all times herein this FBI/SA is Lance Lange who purported himself to be FEMA Officer assisting PR in its Maria's hurricane crisis.

[7] FBI/SA Lance Lange failed to mention that Mr. Vega asked him for what Federal Investigative Agency or Department he was working and took this opportunity to send the Department of Justice a clear message that Naicom was a business licensed and legally authorized to distribute media programming to subscribers in Puerto Rico, United States and Virgin Islands, by showing him a copy of the National Rural Telecommunications Cooperative "NRTC" Member Certificate (Attached hereto as Attachment 16) and that Naicom also had direct programming contracts with several content providers like Turner and Fox.   However, for some reason he left the office with serious doubts which he never expressed his reasons for clarification.

vii.   That Special agents of the Federal Bureau of Investigation (FBI) contacted Phil Welcome, Director of Anti-Piracy Programs for HBO Latin America, and Ramiro Escudero, Director of Asset Protection at DirectTV. Both individuals independently verified that Naicom did not have any relationship with their respective organizations[8].   Nonetheless, Naicom offers its subscribers access to multiple channels of HBO and Cinemax (which is owned by HBO).  See Copy of the Affidavit page 10-11 ¶ 16.  Attachment 28.

viii.   On June 20, 2019 visual testing of a Naicom receiver revealed several channels clearly watermarked by other known IPTV pirates, indicating that Naicom was either purchasing channels from other IPTV pirates or stealing already pirated channels. One of the watermarks, known as the "Beavis and Butthead" watermark, was identified as being affiliated with a known IPTV piracy group called Universal IPTV. Images of watermarked channels are shown below, with watermarks circled in red. See Copy of the Affidavit page 11 ¶ 17.  Attachment 28.

ix.   Based on information provided by NagraStar and information and analysis by FBI, the following observations were made:  The presence of the satellite dishes indicate that the operator of the dishes likely also operates one of two kinds of satellite piracy operations, IKS or IPTV, both of which require servers and other specialized equipment. Much of this equipment has no useful purpose outside of piracy and is usually located on-site. This equipment is used to access, decode, re-encode, and distribute pirated TV programming to paying customers and resellers; and The presence of a radio mast with microwave dishes at the Naicom facility[9] is consistent with broadcasting and receiving television content over the air.  See Copy of the Affidavit page 13-14 ¶ 18 item d.

x.   Financial records for Naicom Corporation, Darwin Quiñones, and Victor Vega yielded evidence of financial transactions between Naicom and other companies owned and operated by either Darwin Quinones or Victor Vega. The companies identified by the FBI include Artist Design Music Publishing Group, registration number 347442, owned by Victor Vega; Kiaras LLC, registration number 2858, owned by Darwin Quinones; SKYFACE Corporation, registration number 344985, owned by Victor Vega. The companies listed above don't appear to provide any services or have any online presence. The companies Listed above don't appear to

---

[8] These statements are inconsistent, as recently as August 13, 2019, Naicom received via mail an invoice addressed to Naicom Company by HBO charging the programming license services under its content distribution agreement with Naicom.  See Copy of Envelop and contents.  Attachment 32.

[9] What the FBI, NagraStar and DISH Network investigators learned at the Naicom Data Center was that the Satellite at the Naicom's roof were used to download the satellites codes provided by content providers to Naicom in order download the programming for distribution through equipment approved by the content providers companies for Naicom further licensed distribution to its registered subscribers.

make or receive revenue from known services. There are recurring transactions[10] made between Naicom Corporation to Kiaras LLC in the amount of $2,000.00 each month. This behavior is consistent with money laundering, i.e. Quinones and Vega knowingly transferred money into and out of Naicom's accounts using unlawful proceeds from their satellite TV piracy business into other corporate accounts to disguise the nature of their income from an illegal TV piracy business.   See Copy of the Affidavit page 14-15 ¶ 19.

Finally, the request to seize computers, electronic storage, and forensic analysis that might serve as direct evidence of the crimes described on the warrant is nothing more than a ruse recommended by NagraStar, Kudelski Group and DISH Network employees and investigators to allegedly find incriminating evidence at Naicom Data Center for use by the Department of Justice, Federal Bureau of Investigation Agents as a tool to gain secret trade and code sources of Naicom's DISME  proprietary software and advance NagraStar, Kudelski Group and DISH Network own business interest in telecommunications industry to broadcasting its programming via internet a solution to Dish Network obsolete Satellite signal Television services in a possible violation of the United States laws.[11] See Copy of the Affidavit pages 16 through 22.

## THE ILLEGAL EXECUTION OF SEARCH WARRANT

On August 27, 2019, Special Agent in Charge of the Investigation Lance Lange and his squad of FBI Agents showed up at Naicom Corporation Business Offices located at 701 Ave

---

[10] There is nothing illegal with the transactions, Kiaras money payments transfers to Naicom is due to a contract servers services that Naicom provides to Kiaras' in storing Kiaras' Time and Attendance software and business records which was develop by Darwin.  Go to Kiaras.com for more information.   Regarding Artist Designs and Skyface money transfers to Naicom account and vise-versa is due that prior to finding the investor for Naicom willing to invest $15,000,000 (Fifteen Millions dollars) after completing its due diligence through one of the most prestigious Law Firms of Puerto Rico, the truth is that Darwin and Victor Vega as the owners of these company had to borrow and lend from each other companies in order to survive a financial crisis. There was nothing illegal with the transaction or the FBI would have had a money laundering indictment long time ago.

[11] Claimant submits that these actions have the potential effect of violating the United States laws under the Computer Fraud And Abuse Act (18 U.S.C. § 1030(A)); Rico (18 U.S.C. § 1962(C));  Rico Conspiracy (18 U.S.C. § 1962(D)); Wiretap Act (18 U.S.C. §§ 2510-22) Stored Communications Act (18 U.S.C. §§ 2701-12); Digital Millennium Copyright Act (17 U.S.C. § 1201 Et Seq.); Misappropriation Of Trade Secrets Under The Defend Trade Secrets Act (18 U.S.C. § 1836 Et Seq.).

Ponce de Leon, Suite 208; and his Second in Charge Agent Kevin Reaves showed up with his squad of FBI agents at Naicom Data Center in Carolina.

1. The Naicom Corporation Business Offices, Artist Designs and Management Corporation, and Kiaras, LLC Search.

On August 27, 2019, at 12:18 PM FBI/SA Lance Lange and his squad of FBI Agents and entered Naicom Corporation Business Offices and asked its employees for Darwin Quiñones and Victor Vega and requested them to move to the reception area because there was an investigation going on against Naicom and they were going to search[12] the office.  See Copy of Picture of Video Surveillance Cameras[13] at Naicom's Offices page 1.   Attachment 29.

FBI Agents later intervened with Naicom staff member Yamila Garcia for trying to remove her personal purse from the desk to the reception area.  See Copy of Picture of Video Surveillance Cameras at Naicom's Offices page 2.   Attachment 29.

FBI Agents then called Naicom staff member Yamila Garcia again to the center-back of the office to have her identify Darwin and Victor Vega's offices and also requested her to open[14] Artist Designs and Management Corporation office located at Suite 207, which was not included in the Search and Seizure Warrant and is entered separately from office 208.   See Copy of Picture of Video Surveillance Cameras at Naicom's Offices page 3-4.   Attachment 29.

From 12:30 AM through 1:15 (45 minutes) PM the FBI Agents then began to wander around Naicom and Artist Designs offices and hallway entrance without searching for anything

---

[12] The FBI did not provide Naicom's employees with copy of the search warrant and affidavit.

[13] Naicom has available the live video for the convenience of the Court.

[14] When the FBI requested her to open the door she informed the FBI Agents that this office belonged to Artist Designs and was not part of Naicom, however, the FBI Agents insisted her to open the door regardless because they were going to search that office too.

like if they were waiting for some other staff to perform the search.    See Copy of Picture of Video Surveillance Cameras at Naicom's Offices page 4 through 12.    Attachment 29.

At 1:15 PM two unidentified civilians[15] (Male and Female) showed up at the entrance of Naicom Offices and were welcome by the FBI Agents.    See Copy of Picture of Video Surveillance Cameras at Naicom's Offices page 13.    Attachment 29.    From 1:16 PM through 1:43 PM (27 minutes) these Two civilians proceeded to enter Naicom's and Artist Designs's Offices and search both offices sometimes in the company of FBI Agents or alone.    See Copy of Picture of Video Surveillance Cameras at Naicom's Offices page 14 through 22.    Attachment 29.    At 1:44 PM the female civilian entered Artist Designs Music Studio and performed a search of its premises.  See Copy of Picture of Video Surveillance Cameras at Naicom's Offices page 23.    Attachment 29.  At 2:03 PM the male civilian exited Naicom's offices and entered Artist Designs Music Studio alone to perform a search of its premises.  See Copy of Picture of Video Surveillance Cameras at Naicom's Offices page 24-25.    Attachment 29.  At 2:06 PM the male civilian reentered back into Naicom Office and met with FBI Agent Lance Lange who provided him with copies of Naicom's and Artist Designs' keys that he tested on both entrance doors.    See Copy of Picture of Video Surveillance Cameras at Naicom's Offices page 26-27. Attachment 29.    At 2:46 PM both civilians entered business office of Naicom alone and performed a search in that office.    See Copy of Picture of Video Surveillance Cameras at Naicom's Offices page 28.    Attachment 29.    The civilian staff remained in the business office until the FBI broke opened Victor Vega's office door and then proceeded both of them to search Victor Vega's office.  See Copy of Picture of Video Surveillance Cameras at Naicom's Offices

---

[15] Naicom staff asked FBI Agent about these two civilians' presence in Naicom's Offices and were told by the FBI Agents that they were FBI investigators.   It was later learned that these civilians were employees of NagraStar and DISH Network.

page 30-31.   Attachment 29.   At 3:03 Darwin arrived at Naicom's offices in the company of Victor Vega and Naicom's Attorney Patricia Rivera who was denied access to Naicom offices by FBI Agents.   See Copy of Picture of Video Surveillance Cameras at Naicom's Offices page 32-33.   Attachment 29.   At 3:18 PM Victor Vega recognized FBI Agent Lance Lange from his former visit to the office and after showing Naicom programming contract and other distribution license indicated him that he was committing serious statutory and constitutional violations,  See Copy of Picture of Video Surveillance Cameras at Naicom's Offices page 34.   Attachment 29. At this same time the male civilian began searching Naicom's computers for various hours.  See Copy of Picture of Video Surveillance Cameras at Naicom's Offices page 34 through 36. Attachment 29.   Many viewers in the building witnessed the show given by the FBI Agents and its counterparts from DISH Network.  See Copy of Picture of Video Surveillance Cameras at Naicom's Offices page 37-41.   Attachment 29.

2.   The Naicom Corporation Data Center Search

On  August  27,  2019,  at  on  or  about  12:00 PM  FBI/SA  Kevin  Pearson  ("FBI  SA Pearson") and his squad of FBI Agents and other civilians entered Naicom Corporation Data Center and asked its employee Jaime Echevarria for Darwin Quiñones and requested his phone number and his presence at the premises because they were going to search[16] and shut down the operation at the Data Center for running a tv pirate business.  See Copy of Picture taken at the Data Center.  Page 42.  Attachment 29.

---

[16] For a full account of the events that took place during the search please refer to the Sworn Declarations filed in support of this motion submitted by Darwin Quiñones-Pimentel, Jaime Echevarria-Roman and Wilfredo Ramos-Acevedo which are incorporated herein by reference.  See Exhibits 1-3.

After a phone call conversation with FBI SA Pearson Darwin showed up at the Data Center and was received by FBI SA Pearson and a civilian[17].

Upon arriving at the Data Center FBI SA Pearson advised Darwin that he was shutting down the operation and confiscating all the equipment because he was running a tv pirate operation within his data center.   Darwin entered the Data Center and observed FBI agents and civilians[18] searching the offices, the servers and computers room, taking pictures and checking and handling the equipment that operated Naicom TV.   During the intervention Darwin and his employee Jaime Echevarria were questioned and interrogated by both the FBI agents, Dish Network and NagraStar investigators regarding Naicom's programming distribution operation system its technology, functions and protocols.   Darwin requested an opportunity to prove FBI SA Pearson that he was running a legitimate operation and that he had all the licenses needed to operate the Naicom IPTV business and after several discussions and proof of contracts FBI SA Pearson decided to terminate the search and not confiscate or shut down the Data Center and decided to interview Darwin and his partner Victor at the FBI Offices in San Juan.

At the San Juan offices FBI SA Pearson interviewed Darwin and his partner Victor regarding the legality of the IPTV distribution contracts with content providers and after being convinced that Naicom was kosher FBI SA Pearson allowed Naicom IPTV to continue it IPTV operation.

---

[17] This civilian was later identified has Jordan Smith, NagraStar investigator.
[18] The other identified civilian was at all times mentioned herein Kevin Gedeon, Dish Network investigator.

## **ARGUMENT**

<u>JURISDICTION AND VENUE</u>

This Court has Equitable Jurisdiction under <u>Fed. R. Crim. P. 41 (g)</u> to order the return the property and items seized and this Court is the proper Venue for this Action.

<u>Federal Rule of Criminal Procedure 41 (g)</u> provides:

> A person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return. The motion must be filed in the district where the property was seized. The court must receive evidence on any factual issue necessary to decide the motion. If it grants the motion, the court must return the property to the movant, but may impose reasonable conditions to protect access to the property and its use in later proceedings. (emphasis ours) .

First, <u>Rule 41 (g)</u> is the appropriate means for the Claimant to seek the release of his unlawfully seized property and items because the Government has not instituted proceedings for the forfeiture of the property and items seized on either a criminal or civil basis. <u>Rule 41 (g)</u> is described as a vehicle for recovering seized but not forfeited property. See <u>Turner v. Gonzalez, 2007 WL 1302126 at *1</u> (7th Cir. May 3, 2007); see also <u>Beard v. United States</u>, 2008 WL 2132381 *9 (C.D. Cal. Mar. 10, 2008)(citing <u>United States v. $8,850.00</u>, 461 U.S. 555, 569-70 (1983)(Rule 41 (g) has been applied in other situations where the return of property is sought, including requests by claimants for the return of property is pending and no civil forfeiture proceedings have been instituted.").  Even if civil in rem proceedings were to be commenced at this time, the Court would still retain equitable jurisdiction in that neither the Civil Asset Forfeiture Reform Act of 2000 does not provide for the remedy provided in Rule 41 (g): the return of illegally seized property.

## THE FOURTH AMENDMENT CONSTITUTIONAL VIOLATION

## PROBABLE CAUSE

The Fourth Amendment states: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.   There is a strong preference for the use of search warrants.   See Payton v. New York, 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980).  While the warrant requirement may be dispensed with in certain exigent circumstances that are "few in number and carefully delineated," United States v. United States Dist. Court, 407 U.S. 297, 318, 92 S.Ct. 2125, 2137, 32 L.Ed.2d 752 (1972), the probable cause requirement is rigorously adhered to. See Arizona v. Hicks, 480 U.S. 321, 326-27, 329, 107 S.Ct. 1149, 1153-54, 1155, 94 L.Ed.2d 347 (1987). "Probable cause exists when 'the affidavit upon which a warrant is founded demonstrates in some trustworthy fashion the likelihood that an offense has been committed and that there is sound reason to believe that a particular search will turn up evidence of it' " or that the search will turn up contraband. United States v. Schaefer, 87 F.3d 562, 565 (1st Cir. 1996) (quoting United States v. Aguirre, 839 F.2d 854, 857-58 (1st Cir. 1988).

The standard to apply in determining the sufficiency of an affidavit is whether the "totality of the circumstances" stated in the affidavit demonstrates probable cause to search either the premises or the person. See Illinois v. Gates, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). "Probable cause need not be tantamount to proof beyond a reasonable doubt.... Probability is the touchstone." Aguirre, 839 F.2d at 857, see Gates, 462 U.S. at 244 n. 13, 103 S.Ct. at 2335 n. 13 ("Probable cause requires only a probability or substantial chance of

criminal activity, not an actual showing of such activity.").    To establish probable cause for a premises search, the information available in the affidavit must show "a fair probability that contraband or evidence of a crime will be found in a particular place." Id. at 238, 103 S.Ct. at 2332. An affidavit supporting a request for a search warrant must give the magistrate a "substantial basis" upon which to conclude that there is such a "fair probability." Gates, 462 U.S. at 238-39, 103 S.Ct. at 2332-33. The facts must be judged against an objective standard.    The Supreme Court has adopted a "totality of the circumstances" test to determine when information from a confidential informant or an anonymous tip can establish probable cause.    Illinois v. Gates, 462 U.S. at 238, 103 S.Ct. 2317.  The Court has also explained that an informant's "'veracity,' 'reliability,' and 'basis of knowledge' are all highly relevant in determining the value of his report." Id. at 230, 103 S.Ct. 2317. In Gates, the information came from an anonymous letter which provided no indication of the informant's veracity, reliability, or basis of knowledge. The Court held that the anonymous tip, standing alone, was insufficient to establish probable cause. Id. at 227, 103 S.Ct. 2317.  However, it explained that "a deficiency in one [factor] may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." Id. at 233, 103 S.Ct. 2317.  The Court found that the anonymous tip in Gates was sufficient to establish probable cause because it "contained a range of details relating not just too easily obtained facts and conditions existing at the time of the tip, but to future actions of third parties not easily predicted." Id. at 245, 103 S.Ct. 2317. The judgment to be made is:

> when does verification of part of the informant's story make it sufficiently likely that the crucial part of the informant's story (i.e., allegations that criminal activity has occurred and that evidence pertaining thereto will be found in the location to be searched) is true, such as would "warrant a [person] of reasonable caution in the belief' that [a search would be] appropriate," based upon what the informant has said? See Terry, 392 U.S. at 21-22, 88 S.Ct. at 1880.

While eschewing a rigid adherence to each of the Aguilar-Spinelli factors, Gates maintained the relevancy of the considerations set forth in those cases.  Gates does not stand as a total abandonment of standards and rules of law in determining whether the state may intrude on a citizen's privacy.  Nor does Gates mean that reviewing courts are writing on a clean slate when they confront the question of when an informant's information rises to the level of probable cause.  The Gates Court agreed that the Aguilar and Spinelli factors, including "an informant's 'veracity,' 'reliability' and 'basis of knowledge' are all highly relevant in determining the value of his report." Gates, 462 U.S. at 230, 103 S.Ct. at 2328; see Schaefer, 87 F.3d at 566 (the Aguilar and Spinelli factors are "highly relevant," even after Gates). See United States v. Khounsavanh, 113 F3d. 278 (1st Cir. 1997).

The credibility of an informant is enhanced to the extent he has provided information that indicates first-hand knowledge. See United States v. Taylor, 985 F.2d 3, 6 (1st Cir. 1993)(citing United States v. Caggiano, 899 F.2d 99, 102-03 (1st Cir. 1990) ("reliability of informant enhanced if details are derived from informant's personal observation rather than hearsay"); see also Gates, 462 U.S. at 234, 103 S.Ct. 2317 (stating that the informant's "explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed first-hand entitles the tip to greater weight than might otherwise be the case."

Movant submits that the informing company here NagraStar a subsidiary of the competition Dish Network never provided the FBI first-hand information beyond claiming to have observed that:

That The Naicom Service was tested several times to identify if it was providing DISH programming and in each case the test revealed no DISH content. On August 28, 2017, a DirecTV error message was discovered on 14 channels: AMC, Animal Planet, Bein Sports, Cinemax, CNN-Español, Discovery Channel, Disney, E!, Entertainment, ESPN, FX, History Channel, Showtime, and USA.   On September 18, 2017, a DirectTV error messages was discovered on two channels: HBO and History Channel.   On September 19, 2017, a DirecTV error message was discovered on the Showtime Channel.  See Copy of the Affidavit pages 7 ¶ 11.  Attachment 28.

Consequently, an unprompted and routine error message from DirecTV popped up on Naicom's channels while NagraStar was searching through their content. *The probable conclusion is that Naicom, not having any contract with DirecTV, was distributing those channels from DirecTV in an unlicensed manner.* See Copy of the Affidavit pages 8 ¶ 12. Attachment 28.

Significantly none of the information regarding Dish Network investigation had been observed first hand at Naicom's Data Center been the reason why they did not find any illegal or pirate practices the day they executed the search warrant. Contrast United States v. Greenburg, 410 F3d. 63 (1st Cir. 2005), United States v. Barnard, 299 F3rd. 90 (1st Cir. 2002) In evaluating the informant's credibility, it's necessary to first assess the manner in which the informant provided the tip and what interest he had in the outcome of the investigation.

From the tenor of the affidavit the FBI SA Lance Lange the agent in charge of the investigation met Naicom's executives who informed him that they were a legitimate IPTV company and even showed to him the certificate of membership with NRTC given the affiant of the affidavit the opportunity to question Dish Network and NagraStar investigator  the credibility of its investigation and evidence of whether or not Naicom in fact was a member of NRTC and had access to over 344 programing services for IPTV business distribution or if what in fact a tv pirate company. This lack of thorough investigation and real motive of the informing company (Dish Network and NagraStar) undercut the informing company's (Dish Network and NagraStar) reliability.   See Florida v. J.L., 529 U.S. 266, 270, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000). Similarly, the source of information here did not claim involvement in the criminal activity. See United States v Harris, 403 U.S. 573 (1971) reliability established where source makes statement against penal interest.

An independent FBI investigation[19] would have reveal See, e.g., <u>United States v. Lewis</u>, 40 F.3d 1325, 1334 (1st Cir.1994).  "It may be argued that information given to police may be found reliable where the making of a false crime report is a criminal offense, in that once again adverse consequences may follow if the allegations later turn out to be untrue, but this would not be persuasive absent a showing the informant was aware that such an offense existed and that there was a real risk of prosecution should his information prove false." See <u>2 LAFAVE, SEARCH AND SEIZURE</u> Sec. 3.3(c) 149-150 (2004); but that is not the case here. There was no evidence placed before the issuing magistrate that Naicom was in fact running a pirate operation other than the general allegations made by Naicom's competitors Dish Network and NagraStar who had an independent motive to have Naicom search, its operation be shut down, and all its equipment confiscated to conduct reverse engineering under the ruse of discovering criminal evidence for the FBI and to appropriate themselves with Trade Secrete using the FBI as a tool to accomplished their goal.   <u>See Whiteley v. Warden</u>, 401 U.S. 560, 565 n. 8, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971) stating that "an otherwise insufficient affidavit cannot be rehabilitated by testimony concerning information possessed by the affiant when he sought the warrant but not disclosed to the issuing magistrate." Here the affiant merely confirmed NagraStar and Dish Network investigation, this information provided no real basis to believe the FBI actually knew what they were really dealing with and found themselves a surprise when discovered that Naicom IPTV was fully a legal IPTV business.   See Page 44 a picture taken at the Data Center of an FBI Agents in shock and page 45 FBI SA Reaves apologizing to Darwin.  Attachment 29.

---

[19] The FBI failed in this case to run an independent investigation by calling NRTC, Turner Network, Fox Network or even asking Naicom's executive officers to allow an onsite inspection for contracts and systems since they had a complaint to investigate, instead of running blinding to the court and seeking a search warrant with the hope that the informing company just gave them bingo.

Analyzing Naicom IPTV situation under the Supreme Court's decisions on anonymous informants in <u>Alabama v. White</u>, 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990) and <u>Florida v. J.L.</u>, 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000) the information provided lacked the necessary indicia of reliability to establish probable cause because the affiant was not able to fully corroborate sufficiently the information he/she gave. Specifically, the failure to corroborate, with any specificity, predictive information about the future interests of third parties (Dish Network and NagraStar).  Here the FBI only was partially able to corroborate a video tendered by (Dish Network and NagraStar) the FBI never confirmed through its investigative tools if pirate programming transmission ever ran through Naicom's distribution internet traffic from its Data Center to the end users TV Set Top Boxes in some this instances the information provided (Dish Network and NagraStar) source actually proved to be wrong i.e. the FBI later learned after executing the search that Naicom was in fact running a legitimate programming distribution operation with all the licenses duly authorized by the content providers.

The issue for analysis here, is to determine whether the corroboration made it sufficiently likely the issuing justice could have concluded the crucial part of the sources (Dish Network and NagraStar) story-that Naicom was running tv pirate operation was true.   See <u>Khounsavanh</u>, 113 F.3d at 284.   Put another way is the likelihood of lying or an inaccurate informant sufficiently reduced by the quality of corroborated facts and observations is insufficient to establish probable cause absent independent corroboration through police investigation or some other indication of reliability. In <u>United States v. Laurins</u>, 857 F.2d 529, 540 (9th Cir. 1988), cert. denied, 492 U.S. 906, 109 S.Ct. 3215, 106 L.Ed.2d 565 (1989).   It is clear that the Affidavit would fail to establish probable cause to issue the Search Warrant. As will be demonstrated, Claimant asserts the information in the probable section of the Affidavit is subject to a <u>Frank's</u> hearing request

because the affidavit contains statements made with a reckless disregard for the truth as well as material omissions of fact necessary to an accurate assessment of whether probable cause existed.

## THE FRANKS ISSUE

In Franks v. Delaware, 438 U.S. 154, 171, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the Supreme Court emphasized the long-standing "presumption of validity with respect to the affidavit supporting [a search warrant." The Court explained, however, that a criminal defendant could challenge the legitimacy of a search under certain circumstances by attacking the truthfulness of the allegations made in the affidavit supporting the warrant application. Franks directs "a court considering whether to suppress evidence based on an allegation that the underlying affidavit contained false statements [to] apply a two-part test: (1) whether the defendant has proven by a preponderance of the evidence that the affidavit contains deliberately or recklessly false statements and (2) whether the affidavit, without the false statements, provides the requisite probable cause to sustain the warrant." United States v. Charles, 138 F.3d 257, 263 (6th Cir.1998). Carrying this burden entitles the defendant to a hearing to determine if a preponderance of the evidence supports the allegations of lack of truthfulness. Franks, 438 U.S. at 171-72, 98 S.Ct. 2674.

In Franks, the Supreme Court held that the Fourth Amendment entitled a defendant to challenge the veracity of a search warrant affidavit, and that proof of material perjury or reckless disregard for the truth required exclusion of evidence seized under the warrant. 438 U.S. at 155-56, 98 S.Ct. at 2676-77. The Court concluded that a ban on impeachment of the veracity of a warrant affidavit "denied the probable-cause requirement of all real meaning." Id. at 168, 98 S.Ct. at

2682. As indicated by the Court, post-execution review of the warrant is justified because warrants are issued at an ex parte hearing and often in haste, depriving the magistrate of the opportunity to fully consider the affiant's veracity, and trial court review is the only efficacious sanction to prevent the challenged police misconduct. Id. at 169-70, 98 S.Ct. at 2683-84.   See also United States v. Khanani, 502 F.3d 1281, 1289 (11th Cir. 2007); United States v. Le, 173 F.3d 1258, 1269 (10th Cir. 1999); United States v. Matias, 836 F.2d 744, 747-48 (2d Cir. 1988) (citing cases).   A search is executed in "flagrant disregard" of its terms when the officers so grossly exceed the scope of the warrant during execution that the authorized search appears to be merely a pretext for a "fishing expedition" through the target's private property. See, e.g., United States v. Liu, 239 F.3d 138 (2d Cir. 2000); United States v. Foster, 100 F.3d 846, 851 (10th Cir. 1996); United States v. Young, 877 F.2d 1099, 1105-06 (1st Cir. 1989).

The Claimant submits that the affidavit here is possessed of both statements made with a reckless disregard for the truth as well as the material omission of facts necessary to an assessment of probable cause.

It becomes apparent from a careful reading of the affidavit had the FBI investigated thoroughly Naicom's authorization to distribute programming through their IPTV business the FBI would not have even moved the court for a search warrant application.

More importantly the applicant had an obligation to inform the magistrate the sources of the investigation were Naicom's competition, taken together with the failure to accurately investigate amounts to an intentional misleading with respect to the fair inferences to be drawn from the information effectively undercutting the Magistrate's ability to make an informed judgment as to the weight of the opinion evidence offered in the affidavit.

This is especially true where, as here, the FBI already knew from both of Naicom's principal officers that they were a legitimate content distribution IPTV company which also had TV Everywhere "TVE" available for Androids and iPhones.[20] Furthermore, the fact that Walmart/Samsclub approved Naicom Corp a vendor number to sell Naicom Set Top Boxes at their retailers store should have ring the bell to the FBI that Sams Club was not going to sell pirate material at their stores.   Moreover, if the FBI would have not included in their affidavit that they had probable cause that Naicom Corporation was part of a history of IPTV and Television Piracy implicating several violations of federal laws, to wit., 17 U.S.C. § 506 (Copyright Criminal Offenses), 18 U.S.C. § 2319 (Criminal Infringement of a Copyright), as well as Money Laundering, Wire Fraud, and Unlawful Access to Computer Systems the Magistrate Judge would have never issued the warrant because this was a material fact triggering its legal and factual decision to issue the order.   See Copy of the Affidavit page 2 ¶ 4 and page 3-4 ¶ 6. Attachment 28.   Therefore, based on the abovementioned reasons this court should find that the affidavit submitted in this was filed in violation of Fourth Amendment Constitutional rule enunciated in Frank's by the Supreme Court of the United States requires the suppression of the search and seizure warrant order and its seized items and property should be return to Claimants.

### THE SEARCH BY EMPLOYEES OF THE COMPETITION[21]

In this case the FBI agents executed the search warrant at Naicom's Offices, Naicom Data Center, Artist Designs and Kiaras' offices with the assistance of NagraStar, Kudelski Group

---

[20] The FBI knew or should have known that Apple requested verification of contracts prior to approving a pirate company to distribute media programming through its platform could have caused Apple a civil action.

[21] For the record there were at least two known employees of the competition search and seizing items and property at Naicom's Offices, Naicom's Data Center, Artist Designs and Kiaras Offices.   The two known employees are Jordan Smith who works at NagraStar and Kevin Gideon who works at Dish Network. See Attachments 30 and 32.

and DISH Network investigating officers ("Investigators").     These investigators were allowed by the FBI to enter alone Claimant Offices and search and seized property without any legal authorization or authority.     See Copy of Picture of Video Surveillance Cameras at Naicom's Offices displaying the search conducted by the FBI agents and investigators from Dish Network and NagraStar pages 13 through 36.   Attachment 29.  And Page 45 a picture of Jordan Smith at Naicom's Data Center with FBI Agent Pearson.   Attachment 29.

Claimant submits that the affidavit in this case clearly stated "the Naicom Service was tested several times to identify if it was providing DISH programming and in each case the test revealed no DISH content," See Copy of the Affidavit pages 7 ¶ 11.  Attachment 28.

This fact alone should have excluded these investigators from participating, entering and searching Naicom, Artist Designs and Kiaras' premises.  Since Dish Network nor NagraStar had nothing at stake here to investigate, these investigators can only perform investigations for their companies and were not authorized to perform federal investigation under the statutory laws of the United States[22].  Here, the FBI really exceeded its authority.

In addition, the search conducted here exceeded the scope of its authority. The search warrant only authorized entrance to office 208 yet the agents also searched office 207 that is a separate office not covered by the search warrant. The agents were warned about this yet they insisted and searched said office exceeding the terms of the warrant. As recognized in U.S.v. Fagan 577 F.3d 10,13(1st Cir. 2009); *"the authority to search conferred by a warrant is*

---

[22] See 28 U.S.C.A. § 531 § 531. Federal Bureau of Investigation, the Federal Bureau of Investigation is in the Department of Justice; 18 U.S.C.A. § 3052 § 3052. Powers of Federal Bureau of Investigation; 28 U.S.C.A. § 533
§ 533. Investigative and other officials; appointment
The Attorney General may appoint officials--
(1) to detect and prosecute crimes against the United States;
(2) to assist in the protection of the person of the President; and1
(3) to assist in the protection of the person of the Attorney General.2
(4) to conduct such other investigations regarding official matters under the control of the Department of Justice and the Department of State as may be directed by the Attorney General.

*circumscribed by the particular places delineated in the warrant and does not extend to other places."* A search violates the Fourth Amendment if its scope exceeds that permitted by the terms of the issued warrant. Horton v. California 496 U.S. 128,140(1990) It is clear the search of office 207 was illegal and all items seized there have to be returned to Claimants.

In some cases, a search by a private citizen may be transformed into a governmental search implicating the Fourth Amendment "if the government coerces, dominates or directs the actions of a private person" conducting the search or seizure. Pleasant v. Lovell, 876 F.2d 787, 796 (10th Cir. 1989) (Emphasis supplied).   In such a case, the private citizen may be regarded as an agent or instrumentality of the police and the fruits of the search may be suppressed.   Though individuals have a Fourth Amendment right to be free from unreasonable searches and seizures by the government, purely private searches are not subject to constitutional restrictions. Walter v. United States, 447 U.S. 649, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980); Burdeau v. McDowell, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921). "The exclusionary rules were fashioned 'to prevent, not repair,' and their target is official misconduct." Coolidge v. New Hampshire, 403 U.S. 443, 488, 91 S.Ct. 2022, 2049, 29 L.Ed.2d 564 (1971) (quoting Elkins v. United States, 364 U.S. 206, 217, 80 S.Ct. 1437, 1444, 4 L.Ed.2d 1669 (1960)). The government may not do, through a private individual, that which it is otherwise forbidden to do.   Accordingly, if in light of all the circumstances a private party conducting a search must be regarded as an instrument or agent of the government, the Fourth Amendment applies to that party's actions. Coolidge, 403 U.S. at 487, 91 S.Ct. at 2048.   When a private individual conducts a search "as an instrument or agent of the Government," Skinner v. Railway Labor Executives' Ass'n, 489 U.S. 602, 614, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989), the limits imposed by the Fourth Amendment apply.   In deciding whether a private person has become an instrument or agent of the government, two

important inquiries are: "1) whether the government knew of and acquiesced in the intrusive conduct, and 2) whether the party performing the search intended to assist law enforcement efforts or to further his own ends." United States v. Miller, 688 F.2d 652, 657 (9th Cir.1982); Walther, 652 F.2d at 792; accord United States v. Snowadski, 723 F.2d 1427, 1429 (9th Cir.), cert. denied, 469 U.S. 839, 105 S.Ct. 140, 83 L.Ed.2d 80 (1984) (cited with approval in United States v. Lamport, 787 F.2d at 476).    A person will not be acting as a police agent merely because there was some antecedent contact between that person and the police. United States v. Coleman, 628 F.2d 961 at 965 [(6th Cir. 1980)].   The Ninth Circuit has held that, "two of the critical factors in the 'instrument or agent' analysis are: (1) the government's knowledge and acquiescence, and (2) the intent of the party performing the search." United States v. Walther, 652 F.2d 788, 792 (9th Cir. 1981). In United States v. Attson, 900 F.2d 1427, 1433 (9th Cir.1990), the Ninth Circuit added a gloss to its rule:

> [A] party is subject to the fourth amendment only when he or she has formed the necessary intent to assist in the government's investigative or administrative functions; in other words, when he or she intends to engage in a search or seizure. However, under this test, the fourth amendment will not apply when the private party was acting for a reason that is independent of such a governmental purpose.

In United States v. Smythe, 84 F.3d 1240, 1243 (10th Cir. 1996), the Tenth Circuit required that the government must "affirmatively encourage or instigate the private action." This is determined by "the totality of the circumstances." Various tests have developed for determining whether a private entity has acted as a government agent. For example, see United States v. Pierce, 893 F.2d 669, 673 (5th Cir.1990). United States v. Lambert, 771 F.2d 83 (6th Cir.1985) The Fourth Circuit has stated the rule as follows: "First, courts should look to the facts and circumstances of each case in determining when a private search is in fact a Government search.  Second, before a court will deem a private search a Government search,

a defendant must demonstrate that the Government knew of and acquiesced in the private search and that the private individual intended to assist law enforcement authorities." See United States v. Jarrett, 338 F3rd. 339, 346 (2003).  As the First Circuit concluded in United States v. Pervaz, 118 Fed 3d. 1 (1st Cir. 1997):

> "We think that any specific "standard" or "test" is likely to be oversimplified or too general to be of help, and that all of the factors mentioned by the other circuits may be pertinent in different circumstances: the extent of the government's role in instigating or participating in the search, its intent and the degree of control it exercises over the search and the private party, and the extent to which the private party aims primarily to help the government or to serve its own interests." Pervaz at 3.

The Affidavit sworn in support of the Search Warrant acknowledges these investigators work for the competition (Dish Network and NagraStar) who initially filed the complaint with the FBI and later confessed that Naicom was not using its equipment, which brings us to the question of what were these investigators ultra-motives in assisting the FBI in executing the search warrant, were they performing the search intended to assist law enforcement efforts or to further his own ends,  by using the FBI as an instrument to investigate and destroy the competition.  Moreover, it is clear from the record in this case that any legitimate investigative purpose dissipated the moment they informed the FBI that Naicom was not using their equipment.

Therefore, the FBI clearly violated the law when it allowed the (Dish Network and NagraStar) investigators to participate in the search executed at Naicom's Offices and Data Center, Artist Designs and Management Corporation and Kiaras, LLC requiring the Search Warrant issued against Naicom Corporation be suppress and void and have the property and

items seized and information gain from its servers and computers[23] be return to Claimants accordingly, this was unlawful search.

**WHEREFORE** it is respectfully requested that after this Court conducts a hearing it find that the search conducted by the FBI and Dish Network employees was illegal and order the return of all seized items and provide any other protective order[24] and remedy it deems appropriate.

**RESPECTFULLY SUBMITTED.**

I hereby certify that on this same date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all parties involved.

In San Juan, Puerto Rico, this 6th day of September, 2019.

**RAFAEL F. CASTRO LANG**
**USDC-PR#128505**
Attorney for Defendant
P O Box 9023222
San Juan, PR 00902-3222
Tel: (787)723-3672/723-1809
Fax: (787)725-4133
rafacastrolang@gmail.com;
rafacastrolanglaw@gmail.com

---

[23] The Stored Communications Act ("SCA") provides for civil damages (including, in some cases, punitive damages), as well as the prospect of disciplinary actions against officers and employees of the United States who have engaged in willful violations of the statute. See, e.g., Freedman v. American Online, Inc., 303 F. Supp. 2d 121 (D. Conn. 2004) (granting summary judgment on liability under the SCA against police officers who served on AOL a purported search warrant that had not been signed by a judge).

[24] The Court should require the FBI and Dish Network to certify under oath if any reverse engineering of Niacom's operations were conducted and take appropriate action if it occurred.